AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
District of Delaware

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )        Case No. 18-*189 M*
███████████, Wilmington, DE 19802 )
and the conjoined business at )
███████████, Wilmington, 19802 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

2601 Carter Street, Wilmington, DE 19802 and the conjoined business at 109 E. 26th Street, Wilmington, DE 19802(as more fully described in Attachment A)

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized):*



The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666 | Theft of Public Funds |
| 18 U.S.C. §1343 | Wire Fraud |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Quiana Capers - HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/17/18__

_____
*Judge's signature*

City and state:  Wilmington, Delaware

The Honorable Christopher J. Burke
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Quiana Capers ("Affiant"), Special Agent ("SA"), U.S. Department of Health and Human Services, Office of the Inspector General, Office of Investigations being duly sworn, depose and state as follows:

### Affiant Background

1. I am a Special Agent of the U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG") and have been so employed since January 2017. I have received basic federal law enforcement training and completed all required training for Special Agents with my Agency. Prior to becoming an Agent, I was an Analyst and Investigator for the United States Postal Service Office of Inspector General. As such, I have 4 years of experience investigating a wide range of criminal violations as they pertain to federal law. In that time I have been assigned to cases in which many different investigative techniques were utilized in furtherance of investigations, I have interviewed subjects and witnesses, performed analyses of various types of records, and conducted physical and electronic surveillance. I am currently assigned to the HHS-OIG Philadelphia Regional Office where I conduct criminal investigations of federal law, including cases involving fraud and misconduct related to HHS programs and operations. This includes fraud involving HHS federal subsidy programs, Medicare and Medicaid fraud, drug diversion, and child support enforcement crimes.

### Introduction and Purpose of Affidavit

2. This affidavit is made in support of an application for the search of 2601 Carter Street Wilmington, DE 19802 and its conjoined business location at 109 E 26th St. Wilmington, DE 19802, more fully described in Attachment A ("SUBJECT LOCATION") for violation of federal criminal laws, including violations of Title 18, United States Code (U.S.C), Section 666 (theft or bribery concerning programs receiving Federal funds) and 1343 (wire fraud). Evidence developed throughout this investigation establishes probable cause to believe that BRENDA MATHIS, owner/operator of LJ's Playpen Academy Inc. (hereinafter LJ's) located at the SUBJECT LOCATION, fraudulently billed Delaware Department of Health and Social Services (DHSS) in order to unlawfully obtain federal funds paid out under DHSS Purchase of Care childcare program ("Care Program"). Furthermore, probable cause exists to believe that evidence of these crimes, including business records of LJ's, will be found at the SUBJECT LOCATION.

3. Investigation has shown that there is probable cause to believe that from January 2015 through the present, MATHIS has submitted requests for and received payments of at least $418,133.55 in federal funds, based on false submissions to the Care Program. MATHIS has accomplished this by billing for

services not actually provided, including billing for children who were not enrolled at LJ's and by billing for hours in excess of the care actually provided.

4. The information in this affidavit is based on my own knowledge, government documents, and details relayed to me by criminal investigators and others familiar with this matter. In particular, the information includes information relayed to me by Social Services Senior Administrator and other DHSS staff. I have not included in this affidavit all of the information known to me about this case, but have included only those facts pertinent to the issue of whether probable cause exists to believe these crimes have been committed and that evidence of those crimes will be found at the SUBJECT LOCATION.

## Federal Programs

### A. Child Care and Development Fund block grant and Department of Health and Human Services

5. The Child Care and Development Fund (CCDF) block grant program is a Federal-State partnership between the Department of Health and Human Services' (DHHS) Administration for Children and Families and the states. CCDF provides eligible, low-income families with help paying for childcare at a provider of their choice. Delaware DHSS administers the federally funded Care Program. Though administered by DHSS, the Care Program is funded in full by HHS.

6. Under Care Program rules, a parent seeking the Care Program subsidies for childcare can go to the nearest Division of Social Services (DSS) office and submit an application or apply online. If DSS determines that the applicant is eligible for the Care Program, the applicant selects a DHSS approved childcare provider. DHSS will then pay a subsidy directly to the childcare provider for all authorized children. The amount of the subsidy depends on the number of hours of care the approved childcare provider actually provides to the child. On or after the first day of the following month that the childcare is provided, the provider submits attendance via the Provider Self Service ("PSS") system. The provider can log into the PSS system through any compatible device to include but limited to a PC, laptop and/or cell phone. DHSS then generates payments to the direct deposit account on file provided by the provider. The PSS system is the portal utilized by the Care Program to track the attendance submitted by providers in order to pay them. Providers are required to accurately report items for which payment is claimed and services are rendered. Childcare providers must follow these regulations in order to receive reimbursement under the Care Program and contract.

7. In addition to submitting attendance reports through the PSS system, DHSS providers are required to keep and maintain accurate attendance reports onsite. The provider receives a childcare daily attendance report every month, which is system generated by DHSS. This attendance report has the name of all children authorized for the provider's site in calendar form where the provider tracks the attendance using DHSS approved codes for billing. These attendance reports allow the provider to track and record attendance for authorized children on a daily basis, prior to entry of the monthly attendance submission on the PSS system.  For each child's submission, the children on the daily attendance reports need to match the monthly summary attendance reports submitted by the provider and/or authorized users in the PSS system. The Care Program provider contract requires that the daily attendance reports are kept onsite at the provider's location and must be kept for a minimum of three years.

## B.  LJ's Playpen Academy

8. LJ's is a DHSS licensed childcare provider owned and operated by BRENDA MATHIS. MATHIS provides the childcare services from her childcare center located at the SUBJECT LOCATION. DHSS records indicate that MATHIS has been a licensed daycare center provider since 2007. Since January 2015, Mathis has been receiving monthly childcare payments between $ 30,000 and $110,000 under the Care Program. The payment amount is based on the representation by MATHIS to DHSS regarding the number of children she cares for and dates and hours of attendance at the childcare center.

9. DHSS rules and regulations require providers complete a mandatory 2-hour training within two months of entering into a new provider contract with the Care Program. This Care Program orientation training informs providers and/or participants of the rules and regulations that DHSS requires of its childcare providers. All providers must attend the training before they can receive payment from the Care Program.  DHSS records also reflect that MATHIS signed and dated the most recent Care Program contract on or about May 18, 2015, stating that she is in compliance with all DHSS and Care Program rules.

10. MATHIS, through LJ's, has been an authorized provider under the Care Program and is authorized to care for up to 115 children. LJ's current hours of operations are listed from 7:00 a.m. TO 11:00 p.m. Information from attendance logs provided by DHSS indicated that MATHIS regularly bills at or near the full amount of days per child that appears on her authorized list.  Both MATHIS ▮ ▮ have a user identification for the PSS system. However, all logins on the account are made using MATHIS's unique login.

11. Beginning in 2015, LJ's has collected over $1,000,000 per year in federal funds to provide childcare services to authorized children. Based on a review of the DHSS record, it appears that the Care Program daily attendance reports maintained at LJ's, have, when inspected, not matched the summary attendance reports submitted by MATHIS in the PSS system. Further, records obtained from another service program, the Child and Adult Care Food Program ("Food Program"), which reimburses providers for meals and snacks provided to participating children, indicate that many of the same children billed on the attendance logs for the Care Program are billed for less or no days on the Food Program records. Moreover, as set forth below,, information provided by DHSS child care program monitors ("PMs") and Social Service Administrators also support the conclusion that LJ's is not providing childcare services at the level reported to DHSS.

## C. Star Tiered Reimbursement Payment

12. In addition to the federally funded Care Program, Delaware Stars for Early Success is Delaware's Quality Rating and Improvement System administered by the Delaware Department of Education. In 2011, the state of Delaware began paying STAR 3, 4, and 5 programs Tiered Reimbursement Bonus Payments ("STAR") based on the number of days of attendance per child eligible for the Care Program. STAR payments are a separate federal funding source, but are tied to the PSS system attendance records reported to the State in connection with the Care Program. The STAR payments are reflective of the level of quality achieved or sustained by the provider's program during the month. While the STAR rating itself is unrelated to attendance of authorized children, the amount paid is on a per child basis and the STAR payment amount is therefore linked to attendance. The STAR payments are also funneled through DHSS and are generally paid out monthly. LJ's is listed as a STAR Level 4 licensed center and programs at Star Level 4 receive reimbursement at 90% of the 2011 market rate. During most months, MATHIS has received STAR payments since October 2015. Based on records by DHSS, from October 2015-July 2018, MATHIS received approximately $1,207,966.93 in STAR payments in addition to the funding provided through the Care Program. Because the STAR payments depend on the same PSS system submissions, false PSS system submissions also fraudulently inflate the STAR payments.

## D. Child and Adult Care Food Program

13. The Food and Nutrition Service (FNS) administers the nutrition assistance programs of the U.S. Department of Agriculture (USDA). One such program is the Food Program. The Food Program serves nutritious meals and snacks to eligible children who are enrolled for care at participating childcare centers. Childcare centers have the option to participate in the Food Program either

under a sponsoring organization or independently in direct agreement with the State administering agency. Under the Food Program, approved childcare centers are reimbursed for meals served to eligible children. Food Program reimbursement is based upon attendance and meal records provided monthly to the state or sponsoring agency by the childcare center.

14. On September 1, 2011, the Delaware Department of Education approved an application completed by MATHIS for LJ's to participate in the Food Program. Per Food Program guidelines, LJ's submits monthly reimbursement claims detailing the attendance and meal counts for the children they serve. These claims are submitted to Catholic Charities, who administers the Food Program on behalf of the State of Delaware as an authorized sponsoring organization.

## Statement of Probable Cause

### A. Investigation of LJ's Playpen

15.

Subsequent investigation, including a review of LJ's records revealed that MATHIS billed for services that were not rendered. First, the records show that MATHIS billed DHSS on a monthly basis for the care of children in the PSS system, but had not recorded those children on Care Program daily attendance reports. Second, MATHIS billed for children who were authorized but no longer attending LJ's. Third, the Food Program attendance records show that there are less days or no days recorded for each month in comparison to the Care Program monthly summary attendance reports in the PSS system for the same children.

16. On or around October 15, 2015, DHSS PM's conducted an onsite visit of LJ's. PM's are responsible for conducting site visits once a year at various facilities and they compare providers' onsite daily attendance reports with the monthly summary attendance reports submitted in the PSS system. During this site visit, the PM's found that MATHIS did not have July, August, and September 2015 daily attendance reports required to be maintained under the contract and made available for review during a site visit. Despite failing to maintain these attendance records, using the PSS system, MATHIS billed the Care Program over the maximum number of permissible days allotted in August and September 2015. In August 2015, MATHIS billed the Care Program for a majority of the authorized children as attending for 23 or 24 days when the maximum number of allotted days for the month of August 2015 was 21 days. In September 2015, MATHIS billed the Care Program for a majority of the authorized children as attending 24 days when the maximum number of allotted days for the month of September 2015 was 22 days. In May 2015, MATHIS also billed the Care Program for 3 children, M.MP, S.MP, and M.M while they were simultaneously enrolled in a new center. The three children should have been billed for 0 days.

17. In May 2016, during a processing of payment for child Z.F., it was noted that LJ's and another childcare center were both billing for Z.F. P.H., the parent of Z.F., was called and verified that Z.F. had never attended LJ's. MATHIS billed the Care Program for approximately six months, from October 2015-April 2016 for Z.F., although Z.F. was enrolled in a different childcare facility and never attended LJ's.

18. On or around August 10, 2017, during another site visit, PM's determined that MATHIS had overbilled DHSS on a monthly basis for children not in her care and/or for more days than children really attended LJ's. DHSS found MATHIS had major attendance discrepancies, which included children who were billed in the PSS system, but never recorded on the Care Program daily attendance reports. The report indicated the following:

    - In September 2016, 65 authorized children were billed in the PSS system, but not recorded in the daily attendance records;
    - In November 2016, 66 authorized children were billed in the PSS system, but not recorded in the daily attendance records;
    - In December 2016, 24 authorized children were billed in the PSS system, but not recorded in the daily attendance records;
    - In January 2017, 34 authorized children were billed in the PSS system, but not recorded in the daily attendance records;
    - In May 2017, 60 authorized children were billed in the PSS system, but not recorded in the daily attendance records; and
    - In July 2017, 45 authorized children were billed in the PSS system, but not recorded in the daily attendance records

19. Additionally, a review of DHSS records shows that DHSS determined between January 2015 and June 2018, multiple overpayments had been issued to MATHIS for inaccurate/improper billing by MATHIS for childcare services. PM's were able to determine the overpayment loss amount by comparing LJ's on-site daily attendance reports to the monthly summary attendance reports submitted in the PSS system by LJ's. As a result, the PM's determined that there were multiple children who were not recorded or recorded incorrectly on the on-site daily attendance reports in comparison to the monthly summary attendance reports in the PSS system.

## B. Analysis of The Care Program and Food Program attendance records

20. The Food Program Attendance and Meal Count reports are used by LJ's to provide a basis for Food Program reimbursement. Between January 2015 and December 2017 LJ's Playpen has submitted approximately 35 monthly attendance and meal reports for the Food Program. Your affiant compared the

Food Program attendance and meal reports, to attendance records submitted by LJ's for the Care Program and identified significant discrepancies. Specifically, your affiant found multiple differences in the number of days claimed for the same child from one program to the next. The Food Program attendance and meal report identifies whether a child attended LJ's regardless of whether the child was fed at the center. Thus, for children participating in both the Food Program and the Care Program, there will be two records of attendance (one attendance record for each program); however, there should not be a difference in the actual days attended.

21. After reviewing eligibility records for the Care Program and Food Program, your affiant identified children who were eligible for both the Care Program and Food Program. After an initial review of Food Program and Care Program records for September 2017, it was determined that children were being marked as if they attended LJ's on the Care Program records but not on the Food Program records. Based on the discrepancies between the Care Program and Food Program records for September 2017, a more detailed analysis was done for the period of January 2015 – December 2017 in order to calculate the amount of fraudulent Care Program billings. Based on this review and analysis, your affiant determined that as of December 2017, MATHIS submitted attendance records on the PSS system to support approximately $418,133.55 in payments, where the attendance and meal reports submitted to the Food Program did not reflect that the children had, in fact, been present at LJ's on the dates billed.

## C. Interview of Parents

22. Based on irregularities of LJ's records, your affiant and other investigators conducted parent interviews of children that MATHIS submitted claims for through the PSS system. On June 7, 2018, three parent interviews were conducted. D.V. (hereinafter Parent #1), the parent of T.V. (hereinafter Child#1), disclosed that her son had attended LJ's on and off over a four year time span. Parent #1 only took Child #1 to LJ's when she was actively working, but when she was not working Child #1 was home with her. The parent said Child #1 stopped attending LJ's in late 2015, when she stopped working. Child #1 did not attend LJ's at any point during 2016. Sometime in 2017, Child #1 returned to LJ's for a brief period. Parent #1 said she might have worked from approximately March–April 2017 and October–December 15 or 16, 2017. Parent #1 noted Child #1 permanently stopped going to LJ's in December 2017. Parent #1 assured investigators that Child #1 only attended LJ's when she was working. Per discussion with an IRS-Criminal Investigation Special Agent assigned to this investigation, the IRS only received a single Form W-2 to report less than $500 in wages paid to Parent #1 during the 2016 tax year. DHSS records showed that MATHIS billed Child #1 for the entirety of 2016. DHSS records also showed that MATHIS billed Child #1 for the entirety of 2017

with the exception of February and March 2017, although Child #1 had not attended LJ's for the entire year. MATHIS also billed in January 2018, although Child #1 permanently stopped attending LJ's in December 2017.

23. D.B. was interviewed (hereinafter Parent #2), the parent of D.L. and R.W. (hereinafter Child #2 and #3), and Parent #2 disclosed that her children stopped going to LJ's in approximately July 2017. DHSS records indicated that from September 2017 through May 2018, MATHIS billed the Care Program for care provided to Child #2 and #3, the maximum allowable number of days, although D.L. and R.W. were not attending LJ's since July 2017.

24. D.M. was interviewed (hereinafter Parent #3), the parent of D.C. (hereinafter Child #4), and Parent #3 indicated that Child #4 started attending LJ's in 2016. Parent #3 said Child #4 went to LJ's Monday-Thursday from approximately 9am-6pm. Child #4 did not attend LJ's on Fridays because Parent #3 did not have to attend GED classes on Friday. The Care Program records showed that Child #4 was billed for near or at the max amount of days from September 2016-March 2018 although Child #4 had only attended LJ's four days a week.

25. Probable cause exist to believe that the search of LJ's will produce evidence of fraudulent billings by MATHIS. Furthermore, as discussed above, DHSS regulations require licensed facilities to maintain records in the facility where childcare is provided. The PM's for DHSS have informed your affiant that they have seen file cabinets and reviewed attendance logs onsite at LJ's. LJ's business records, or the absence of business records are material to the investigation as they may support or contradict the reports filed in the PSS system.

## D. Review of Financial Records and Transactions

26. Your affiant knows from training and experience that those deriving income from fraud will often convert funds to cash in order to conceal its location and source. In connection with this investigation, agents have reviewed the financial records of MATHIS and ▇▇▇▇▇▇, who, between 2015 and the present have maintained multiple accounts at least three different financial institutions. Based on this review, investigators have determined that a substantial sum, totaling over $1.2 Million, of funds received from DHSS was converted into cash by MATHIS and ▇▇▇▇▇▇ between April 6, 2016 and November 21, 2017.

27. As set forth more fully in the Affidavit in Support of an Application for a Seizure Warrant for all funds and shares up to $418,133.55, attached as Exhibit 1, and fully incorporated herein, MATHIS and ▇▇▇▇▇▇ deposited $520,000 in cash at a Navy Federal Credit Union ("NFCU") branch on December 12, 2017.

MATHIS represented to NFCU employees that the cash was ███████████
███████████████████████████ Based on the characteristics of the
money deposited and other observations of the NFCU employees, █████████
██████████████████████ there is probable cause to believe that MATHIS lied
to NFCU to legitimize the source of the cash deposited into the NFCU Account.

## E. Searches of Computers and other Electronic Media

28. Your affiant knows that computer hardware, software, documentation,
passwords, and data security devices may be important to a criminal
investigation in two distinct and important respects: (1) the objects themselves
may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may
have been used to collect and store information about crimes (in the form of
electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits
the government to search and seize computer hardware, software,
documentation, passwords, and data security devices which are (1)
instrumentalities, fruits, or evidence of crime; or (2) storage devices for
information about a crime.

29. Based upon the facts set forth above, your affiant believes that computer
hardware, software, related documentation, passwords, data security devices
(as those terms are described in Attachment B), and data were integral tools of
this crime and constitute the means of committing it. As such, they are
instrumentalities and evidence of the criminal violations discussed in this
affidavit. Rule 41 of the Federal Rules of Criminal Procedure authorizes the
government to seize and retain evidence and instrumentalities of a crime for a
reasonable time, and to examine, analyze, and test them.

30. Based on your affiant's knowledge, training and experience, which includes
previous specialized training and past experience in computer forensics, your
affiant knows that searching and seizing information from computers often
requires agents to seize most or all electronic storage devices (along with
related peripherals, discussed in Attachment B) to be searched later by a
qualified computer expert in a laboratory or other controlled environment. This
is true because of the following:

(1) The volume of evidence. Computer storage devices (like hard disks, and
diskettes), can store the equivalent of thousands of pages of information.
Additionally, a suspect may try to conceal criminal evidence; he or she might store
it in random order with deceptive file names. This may require searching
authorities to examine all the stored data to determine which particular files are
evidence or instrumentalities of crime. This sorting process can take weeks or
months, depending on the volume of data stored, and it would be impractical to
attempt this kind of data search on site, especially at a personal residence.

(2) Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

31. Based upon your affiant's knowledge, training and experience, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

## Conclusion

32. Based on the foregoing, I submit that probable cause exist to believe that MATHIS has committed, among other possible violations of federal law, violations of Title 18, U.S.C. § 666 (Theft of Public Funds) and 1343 (Wire Fraud), by unlawfully obtaining federal funds for herself from the Department of Health and Human Services (DHHS) program administered by DHSS for childcare and that evidence of these violations, described above and in Attachment B, are located at the SUBJECT LOCATION and on electronic media contained therein.

QUIANA CAPERS
Special Agent
U.S. Department of Health and Human Services,
Office of the Inspector General,
Office of Investigations

Sworn to and subscribed
before me this 17th day
of October, 2018.

Honorable Christopher J. Burke
United States Magistrate Judge

## ATTACHMENT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

1. The location to be searched is the business site of LJ's Playpen Academy (LJ's) located at 2601 Carter Street and its conjoined business location at 109 E 26th St. Wilmington, DE 19802. The complex, identified as two separate lots, is established as one building site with a joining walkway. Brenda's Real Estate LLC, an entity controlled by BRENDA MATHIS, is listed in New Castle County Property Records as the owner of both lots.

2. 2601 Carter Street is a tan two-story building located in the center of Carter Street between E 26th and E 27th Street, with an attached three-car garage and parking lot. The west side of the building holds the front glass door/main entrance. During surveillance, it was determined that the front door is located under an awning canopy that displays LJ's Playpen Academy on it, with nearly all the patrons entering and exiting at that door. There is another glass door to the right of the main entrance door when directly facing LJ's, which is closest to the outside play area. The three-car garage has three red doors and the parking lot shares the same space. This parking lot is where staff was observed to park their vehicles and exit for those departing the business. There is a larger parking lot located directly behind the building (LJ's), but based on observations during surveillance, this parking lot is used for other businesses/residences in the area. Multiple windows are on both the front and rear of the building.

3. 109 E 26th Street is a tan two-story building located on the northwest side corner of E 26th Street and Carter Street. The main entrance of the building is located on E 26th Street and holds two front red doors with a black mailbox on the right door when directly

facing the building that displays "109." During surveillance, it was determined that these doors are not used. There is a side entrance and about three top roof exit doors on the west side of the building. Based on observations during surveillance, one of the top roof exit doors has been observed being utilized by persons. The side entrance door has a red stairway below and above the side entrance door there is another red stairway that leads to approximately three top exit roof doors. Multiple windows are on both the front and rear of the building.

4. Photographs of both addresses are attached.



2601 Carter Street is a tan two-story building located in the center of Carter Street between E 26th and E 27th Street, with an attached three-car garage and parking lot. The main entrance is located in the walkway (arrow indicates the walkway/main entrance).

## ATTACHMENT B
## DESCRIPTION OF ITEMS TO BE SEIZED

For the time period January 2015 to the present:

1. Any and all records that show ownership, control, affiliation, and operation of LJ's Playpen Academy, or any other companies, entities, investments, or assets associated with Brenda Mathis, and LJ's Playpen; including but not limited to; complete client files, child attendance records, financial records, articles of organization, corporate resolutions or minutes, other business or corporate records, corporate memoranda, by-laws,  service agreements, contracts, partnership agreements, memoranda of understanding, and other documents evincing ownership, control, affiliation, and operation.

2. Financial statements and reports including, but not limited to; credit card statements, tax return information, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, ledgers, journals, contracts, agreements, statements, bills, invoices, banking and loan records and statements, financial institution records, customer records, correspondence, facsimiles, memorandum, tax-related records or other records utilized in the preparation of tax filings, travel records, and other records related to revenues, expenses, assets, liabilities, financial obligations, capital expenditures, and the receipt, disposition, or expenditure of income, monies, funds, or assets and cash in amounts greater than $5,000.

3. Personnel files/employee information for all current and former employees and/or independent contractors including, but not limited; to applications for

employment, background checks, background study resumes, application forms,

licenses, state registration records related to the employment of child care workers, job

descriptions, time sheets, time and attendance reports, employment agreements,

payment records, performance reviews, hiring records, termination records, contracts,

IRS Forms 1099 and W-2s, Delaware Division of Employment Security quarterly wages

reports, cancelled checks, and expense reimbursement documents.

4.    Property records, receipts, investment records, stock and bond records,

mortgages, promissory notes, handwritten notes, calendars, day planners, logs, records

related to wire transfers or reflecting financial transactions, and records related to or

tending to identify the source, accumulation, disposition, location, or ownership of assets,

money, wealth, or property.

5.    Documents related to staff scheduling including, but not limited to,

calendars, leave requests, activity reports, and employee and contractor work or

staffing schedules.

6.    Records of complaints or containing allegations of billing for services not

rendered or supported.

7.    Books, manuals, memoranda, and documents outlining policies and

procedures for child care or billing.

8.    Records related to alternative office space or storage units where financial,

business or billing records may be maintained, and storage facility keys and passwords

associated with any such location.

9.    Books, manuals, storage media devices, and proprietary software related to

billing, scheduling, financial records and operating systems.

10. All contracts or agreements made between LJ's Playpen, and/or Brenda Mathis, and any government agencies or third parties, as they relate to benefit program contracts, to include but not limited to; CCDF, DHSS, USDA, DOE, STAR, TANF, SNAP, LIHEAP and SSI.

11. Address books, photographs, and other documents or items tending to show the identities of associates or co-conspirators, or tending to identify the location or possession of criminally-derived property.

12. Documents or other items tending to show occupancy, residency, ownership, or possession of the premises to be searched.

13. All records, agreements, contracts, manuals, reports, training materials, or correspondence relating to any local, state or federal agency responsible for oversight of child care service related programs. These should include, but are not limited to, DE Department of Health and Social Services, U.S. Department of Health and Human Services and U.S. Department of Agriculture (food subsidy programs)..

14. Any documentation containing a listing or names of business customers.

15. This warrant authorizes seizure of computer equipment and subsequent search of that equipment for the items specified in this attachment at a law enforcement facility. "Computer equipment" refers to:

A. Computer Hardware. Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, and self-

contained laptop or notebook computers, or tablets); data storage devices (such as fixed or "hard" disks; portable or "floppy" disks; optical storage devices; flash drives, such as USB drives and memory sticks; CDs and DVDs; and electronic devices capable of storing data, such as electronic typewriters, memory calculators, personal digital assistants, and mobile phones or tablets); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, digital cameras, and optical readers); and related communications devices (such as modems, cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

B. Software.  Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word-processing, tax return preparation software, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

C. Documentation.  Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

D. Passwords and Data Security  Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may

include encryption devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

# Exhibit 1

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEIZURE WARRANT

I, Antonino Lo Piccolo, Special Agent, United States Department of Treasury, Internal Revenue Service Criminal Investigation ("IRS-CI"), being duly sworn, state:

## I.    INTRODUCTION

1. I am employed as a Special Agent ("S/A") with IRS-CI, and have been since August 19, 2004. I received a Bachelor's of Science Degree in Accounting from the Pennsylvania State University in 1999. I am currently assigned to the Philadelphia Field Office, Newark, Delaware, post-of-duty. My experience as an IRS-CI S/A has included the investigation of cases involving criminal violations of the Internal Revenue Code, Title 26, United States Code; the Bank Secrecy Act, Title 31, United States Code; and Money Laundering, Title 18, United States Code, Sections 1956 and 1957. I have participated in investigations involving wire fraud, bank fraud, mail fraud, and theft from government programs.

2. I graduated from the Federal Law Enforcement Training Center ("FLETC") on February 11, 2005. There I received instruction on investigative techniques and searches and seizures. I have been trained in the execution of financial search warrants resulting in the seizure of financial documents, United States currency, and tax-related documents. As a federal agent, I am authorized to investigate violation of laws of the United States, including the crimes outlined herein, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

3. This Application and Affidavit of Probable Cause in Support of a Seizure Warrant ("Affidavit") is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The information in this affidavit is based on my personal knowledge; my experience and training; my review of documents and records obtained during the course of my investigation; and information provided to me by other officers and investigators.

4. This Affidavit is submitted in support of an application for a seizure warrant for all funds and shares, up to $418,133.55 contained in the Jumbo Money Market Savings Account numbered ▮▮▮▮▮▮▮ at Navy Federal Credit Union, and held by member ▮▮▮▮▮▮ ▮▮▮ (the "NFCU Account"). Your affiant submits that as set forth below, the Subject Account contains the proceeds of violations of Title 18, United States Code, Section 666 (theft of public funds) and Title 18, United States Code, Section 1343 (wire fraud) or property traceable thereto, and proceeds involved in transactions conducted in violation of Title 18, United States Codes 1956(a)(1)(B)(i) and 1957 (money laundering) and is therefore subject to seizure and forfeiture by the United States.

5. Based upon my experience, as well as my discussion with other knowledgeable law enforcement officers, your affiant believes there is probable cause that the NFCU Account is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, which provide for criminal and civil forfeiture of property that "constitutes or is derived from proceeds traceable to

a violation of …any offense constituting "specified unlawful activity" as defined in Title 18, United States Code, Section 1956 (c)(7), which includes theft concerning programs receiving Federal funds and wire fraud. In addition, there is probable cause to believe that the Subject Account is subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(1), which provides for civil and criminal forfeiture of property involved in violations of Title 18, United States Code, Sections 1956 and 1957. These accounts are subject to seizure pursuant to Title 18, United States Code, Section 981(b) and Title 21, United States Code, Section 853(e) & (f) by Title 18, United States Code, Section 982(b)(1).

6. As set forth in the attached (as Exhibit 1) and fully incorporated Affidavit in Support of Application for a Search Warrant of 2601 Carter Street, Wilmington, Delaware, and its conjoined business location at 109 E 26th Street, Wilmington, Delaware, there is probable cause that BRENDA MATHIS ("MATHIS"), owner/operator of a daycare named LJ's Playpen Academy Inc. ("LJ's), fraudulently billed the Delaware Department of Health and Social Services ("DHSS") for child care services not actually provided in order to unlawfully obtain federal funds intended to reimburse service providers for care provided to qualifying children from low-income households.

## II.  FINANCIAL RECORDS A SHOW PATTERN OF CONVERTING GOVERNMENT PAYMENTS TO CASH

7. Your affiant obtained and reviewed records pertaining to a TD Bank, NA ("TD") business checking account held in the name of LJ's Playpen Academy. The signature card indicates MATHIS opened this account on August 10, 2007 as LJ's Director/Owner. Between January 7, 2015 and May 6, 2015, DHSS paid electronic transfers to this account totaling $322,322.58. Your affiant reviewed DHSS records and confirmed these transfers represent Purchase of Care ("POC") payments made as a result of LJ's submission of monthly attendance reports to DHSS. During the same time period deposits from non-DHSS sources, other than returned items and transfers from related accounts, totaled only $5,305.85. No deposits were made to this account after May 6, 2015. The account was closed on September 1, 2015 with a negative balance at the time of closing.

8. Your affiant obtained and reviewed records of TD personal checking account ending in ████ The signature card indicates ██████████████████ ████████ opened this account on April 7, 2015. From June 2, 2015 to April 13, 2016, the account received combined transfers from DHSS and Delaware Department of Education ("DDOE") totaling approximately $1,212,259.26. Your affiant reviewed DHSS records and confirmed these transfers represent POC and STARS Tiered Reimbursement payments made as a result of LJ's submission of monthly attendance reports to DHSS. During the same time period, deposits from non-DHSS sources, other than returned items and transfers from related accounts, totaled only $34,290.09.

9. In addition to the DHSS transfers paid to ▮▮▮▮ personal checking account ending in ▮ DHSS paid a transfer on April 6, 2016 in the amount of $93,272.91 to ▮▮▮▮ TD personal checking account ending in ▮ The next day ▮▮▮▮ closed the account ending in ▮, withdrawing the account balance of $93,273.91 in currency per TD records. ▮▮▮▮ also closed his account ending in ▮ on April 25, 2016, obtaining an official check in the amount of $35,725.95 at close-out.

10. Your affiant obtained and reviewed records of M&T Bank ("M&T) joint checking account ending in ▮, maintained by ▮▮▮▮ and MATHIS. The records indicate this account was opened on March 21, 2016 with a $25 cash deposit. From April 25, 2016 to November 20, 2017, the account received combined transfers from DHSS and DDOE totaling approximately $2,335,563. Your affiant reviewed DHSS records and confirmed these transfers represent POC and STARS Tiered Reimbursement payments made as a result of LJ's submission of monthly attendance reports to DHSS. During the same time period deposits from non-DHSS sources, other than returned items and transfers from related accounts, totaled approximately $147,620.51. The largest single non-DHSS/DDOE related deposit item is a check in the amount of $30,000 from New Castle County Prothonotary's Office, representing the return of cash MATHIS previously posted as bail on ▮▮▮▮ behalf.

11. Your affiant reviewed cancelled checks written on MATHIS's and ▮▮▮▮ s joint M&T Bank checking account ending in ▮ M&T records show ▮▮▮▮ and MATHIS cashed numerous checks made payable either to themselves individually or to Cash. The cashed checks range in amounts up to $50,000. As of November 21, 2017, the checks negotiated for cash total approximately $623,520. In addition the records show the transfer from ▮, net of transfers back to ▮ of approximately $700,754 to M&T Bank savings account ending in ▮

12. Your affiant obtained and reviewed records of M&T savings account ending in ▮ The signature card indicates ▮▮▮▮ opened this account on March 21, 2016. The records show that on or about May 4, 2016, ▮▮▮▮ deposited the official TD check in the amount of $35,725.95 that ▮▮▮▮ obtained when he closed-out TD account ending in ▮ Deposits and credits posted to account ending in ▮, not including transfers from related bank accounts funded by DHSS and DDOE payments, total only approximately $25,331. Investigators noted cash withdrawals made from the account that range in amounts up to $70,000. As of November 21, 2017, the cash withdrawals from this account total approximately $490,150.

13. Based on your affiant's review of bank accounts that directly received POC and Stars Tiered Reimbursement payments from State agencies and review of bank accounts that received transfers from those bank accounts, ▮▮▮▮ and MATHIS converted over

$1.2 Million in DHSS and DDOE payments into cash between April 6, 2016 and November 21, 2017 as summarized below:

| TD Bank Acct Ending ▮ | Closing Currency Withdrawal | $93,273.91 |
| M&T Bank Acct Ending ▮ | Cashed Checks | $623,520 |
| M&T Bank Acct Ending ▮ | Cash Withdrawals | $490,150 |
| | Total Cash | $1,206,944 |

### III.   USE OF CASH,  CASH DEPOSITS IN EXCESS OF $10,000 INTO PERSONAL ACCOUNTS, AND MISREPRESENTION ABOUT SOURCE OF FUNDS

14. ████████████████████████████████████████████████

15. Your affiant obtained and reviewed records of Navy Federal Credit Union ("NFCU") jumbo money market savings account ▮▮▮▮ and savings account ▮▮▮▮ held by ▮▮▮▮.   The NFCU records indicate that on October 23, 2017, ▮▮▮▮ opened the account ending in ▮▮ and made eight cash deposits totaling $249,900.  The NFCU records also indicate that as of December 11, 2017, ▮▮▮▮ maintained a balance of $5.00 in the account ending in ▮▮  On December 12, 2017, according to internal NFCU correspondence reviewed by investigators, ▮▮▮▮ and MATHIS brought a duffel bag containing cash into a NFCU branch.  The cash from the duffel bag funded the deposit of $400,000 into ▮▮▮▮ account ending in ▮▮ and the deposit of $100,000 into ▮▮▮▮ account ending in ▮▮  The correspondence states the following about the transaction: ████████████████████████████████ As explained in Paragraph 25, there is probable cause to believe that MATHIS's statement about the source of funds is false.

16. The NFCU records also reflect the deposit on December 12, 2017 of $20,000 into joint checking account number ████████ belonging to ████████ and MATHIS. On the previous day the joint account held a balance of $1.00.

17. Your affiant spoke with the NFCU employees who handled the December 12, 2017 deposits of cash carried into the branch in a duffel bag. They advised your affiant that MATHIS stated while the deposits were made that MATHIS had withdrawn the entire amount of cash at once from an account she held at a different bank. According to an employee, MATHIS remarked that "you should have seen the face on the Bank when I asked for the money" in reference to the withdrawal she represented she made from another bank. The NFCU employees also told your affiant that the cash MATHIS and ████████ presented consisted of newer, primarily $20 bills. The NFCU employees felt this was an unusual denomination given MATHIS said she had withdrawn the entire amount at once from her bank. The NFCU employees further advised your affiant that a $20 bill is not considered a large denomination and that NFCU would not ordinarily distribute $20 bills to a customer who requested a large sum of cash, due to the large volume of $20 bills needed to accommodate a large withdrawal. The NFCU employees also told your affiant that the cash was removed from the duffel bag in stacks, only some of which were wrapped with bank straps. The other stacks were banded together with generic rubber-bands.

18. 

IV. 

19.

20.



21.

22.

23.

24. Your affiant reviewed a summary provided by DHSS of POC and STARS Tiered
reimbursement payments made to LJ's during 2016. The summary shows LJ's received
payments related to these programs totaling $1,636,327.38. Corporations are required to

report gross receipts or sales on Line 1(a) of Form 1120. 

25.

26.

27. Your affiant knows from his training and experience as a special agent that those deriving income from fraud or evading taxes will often convert funds to cash in order to conceal its location and source. Based on the investigation conducted to date and as set forth in the incorporated affidavit, LJ's is submitting false attendance records to DHSS, causing DHSS to direct fraudulently inflated POC and STARS Reimbursement payments into accounts controlled by MATHIS and ████████ Based on investigators' review of bank records relating to those accounts a substantial sum, totaling over $1.2 Million, of funds received from DHSS was converted into cash by MATHIS and ████████ between April 6, 2016 and November 21, 2017.

28.

29. As noted above, MATHIS and ████████ deposited $520,000 in cash at a NFCU branch on December 12, 2017. MATHIS represented to NFCU employees that the cash was ████████████████████████████████████ Based on the characteristics of the money deposited and other observations of the NFCU employees,

████████ it's your affiant's believe that MATHIS lied to NFCU to legitimize the source of the cash deposited into the NFCU Account. Based on NFCU records, as of August 8, 2018 ████████ maintained a balance of $652,906.19 in ██ Jumbo Money Market Account ending in ████ There were no significant deposits made to the account between December 12, 2017 and August 8, 2018, except for a $50,000 transfer from ████████ NFCU savings account ending in ████.

30. ████████████████████████████████████████████████████████████████

## V.   CONCLUSION

31. As set forth above, and in the Attached Affidavit In Support of Application for Search Warrant of 2601 Carter Street Wilmington, Delaware, there is probable cause that on October 23, 2017 and December 12, 2017 MATHIS and/or ████████ deposited into their personal accounts at NFCU a total of $769,900 in cash derived from the operation of LJ's Playpen Academy. This Affidavit establishes probable cause to believe that MATHIS violated Title 18, United States Code, Section 666(a)(1) (theft of public funds) and Title 18, United States Code, Section 1343 (wire fraud), by billing for and receiving payments from DHSS of at least $418,133.55 for childcare services not actually provided. This Affidavit further establishes probable cause to believe that the funds up to $418,133.55 contained in ████████ NFCU ACCOUNT, are proceeds traceable to the Section 666 and 1343 violations, and are funds involved in transactions conducted in violation of Title 18, United States Code, Sections 1956 and 1957, and therefore may be seized for forfeiture pursuant to Title 18, United States Code, Sections 981, Title 18, United States Code, Section 982, Title 21, United States Code, Section 853 (e) and (f) and Title 28, United States Code, Section 2461.

Antonino Lo Piccolo
Special Agent
Internal Revenue Service
Criminal Investigations

Sworn to and subscribed
before me this            day
of October, 2018.

Honorable Christopher J. Burke
United States Magistrate Judge